Good morning, Your Honor. May it please the Court, Allison Ellert on behalf of Plaintiff Dylan Stewart. With the Court's permission, I'd like to reserve five minutes of time for rebuttal. All right. Pending before the Court today are actually two appeals. The first is a merits appeal from the District Court's Entry of Summary Judgment for Defendant San Luis Ambulance on Mr. Stewart's California State Law wage and hour claims. The second appeal is SLA's appeal of the District Court's Award of Attorney's Fees to Mr. Stewart on the two overtime compensation claims on which he prevailed. So I'd like to first address the merits appeal, and in particular the rest break claims and the meal period claims. Mr. Stewart was an EMT with SLA for about 18 months, and there's no dispute that he frequently worked in 24-hour shifts and that during those shifts he was required to remain on call throughout each of those 24 hours, prepared to respond to incoming emergency calls immediately, irrespective of anything else going on. Now, with respect to the rest break claim, the issue is, are on-call rest periods compliant with California law? So doesn't Augustus resolve this issue? It does entirely, Your Honor. At the time the District Court held in favor of SLA on that issue, it didn't have the benefit of the Augustus decision, and Augustus does conclusively resolve it. Well, perhaps you should move on and see if the opposing counsel takes issue with that. Fair enough, Your Honor. Fair enough. I would ask one question. Tell me why I should go with the Augustus decision when on the other hand we have the Ocmulgee and the Monzon cases that apply in these, if you will, ambulance industry cases. My biggest problem is that when I look at the wage orders, they seem pretty close, and yet it seems to me there's a tension between the interpretation of the wage order 4 and the California court's recognition of special considerations that apply to the ambulance industry, which are recognized in my book in 3K of wage order 9 and Ocmulgee and the Monzon. So I'd like you to answer. I mean, it seems to me it was an easy one, your question, your answer to Judge Rawlinson, because it just fed on exactly what you pled. But I think the biggest problems are what would Ocmulgee and Monzon tell me, and what would 3K of the wage order 9, how would that deal with that? Sure, Your Honor. First of all, Ocmulgee and Monzon really, I think, go to the issue of the meal break claim and not the rest break claim. Well, I know, but it seems to me that what Ocmulgee and Monzon really deal with are, if you will, special considerations which are given for the ambulance industry's need to have 24-hour shifts of duty, and they gave special consideration given the ambulance industry. And so my worry is would really the California Supreme Court just follow right along and do what they did in this other wage order, or would they look at it differently simply because it's an ambulance industry problem? I think I understand your question, and the answer is they would not look at it differently. Why? There is no special wage order governing strictly the ambulance industry. There is no special body of law that applies exclusively to that industry. The provision 3K that you're . . . They had no trouble helping the ambulance industry when they were talking about overtime. That's correct, and that's provision 3K that you're referring to. But Section 3K of the governing wage order does not swallow all the other provisions in that wage order. I appreciate it doesn't swallow, but what it does is when there's language which is similar, if in fact the ambulance industry needs additional consideration based on the idea that overtime doesn't really fit in, can I really say I know where the California Supreme Court is going? Yes, for several reasons. First of all, you've identified it exactly right. 3K deals with overtime compensation. It doesn't deal at all with the on-duty versus off-duty. I agree. And there's nothing in the wage order that says that 3K is somehow . . . renders nugatory all the other provisions of the wage order. I think there are two . . . If this were before the California Supreme Court, I think there are two things that would be front and center for that court. It would say first, as it does throughout Augustus, this state interprets California's labor law liberally in favor of workers' rights. That decision is replete with that . . . They didn't quite say that in Ocmulgee or Monzon. Well, again, Ocmulgee and Monzon really deal with overtime compensation. I understand, but the consideration is nonetheless the same. If they were going to say, we've always said that the wage earners are going to have large leeway in how we interpret our laws, they could have easily said, overtime shouldn't have got the consideration it did in those cases. Well, I think the relevance of both those cases, and certainly the way the district court interpreted the relevance of those cases, was as to this in-writing requirement on the on-duty meal period revocation language. Now, what's interesting is Ocmulgee actually had a written agreement, and in Monzon, the holding of Monzon is actually fairly narrow. It says an employer and an employee can agree to exclude from straight, compensable time the time the employee spends sleeping. That's all it says. And I think the district court read more into the holding of Monzon than that case really bears. Now, there's a few other reasons why I think the California Supreme Court would not follow Monzon here. I want you to tell me that, but I mean, the bottom line when I looked at this case, I said, why not certify it over to the California Supreme Court and let them decide this issue? Why should I do that? That is an option before this court. I can't deny that. But I think this court has enough information and the relevant legal authorities in front of it that I think it can confidently say how the California Supreme Court might decide this. Counsel, may we assume that the Supreme Court was aware of the rulings in Ocmulgee and Monzon when it rendered the Augustus decision? Absolutely, because it cites Monzon in the Mendiola decision from 2015. But it does not apply to ambulance workers. Mendiola says that, but Mendiola is quite critical of Monzon. It acknowledges. But it didn't overrule it, did it? That is true, Your Honor. It did not overrule it because the issue was not squarely presented in front of it. But it says Monzon is not a paragon of clarity. It's a limited holding. So the applicability of Monzon here, it's not applicable at all because it dealt with a completely separate provision, for one thing. And then given the somewhat dim view, I would say, that the California Supreme Court has taken of Monzon, I think this court can fairly infer that the California Supreme Court would not follow it. To answer my question, I mean, that's my problem. I appreciate your answer. So I think for those reasons, we've segued a bit into the meal period violation issue. And really from our perspective, this is a matter of straight-up statutory interpretation. The wage orders are construed according to ordinary rules of statutory interpretation. To provide a strictly on-duty meal period, which is what we all agree SLA did, the employer has to comply with the three statutory prerequisites to do that. The first of those is it has to make a showing that the nature of the work is such that an on-duty meal period is the only viable option. The second is that the employer and employee must enter into a written agreement to that effect. And third, the employer has to give the employee written notice of his right to revoke the on-duty meal period at any time. So, counsel, what's your strongest case to support the notion that if the employer, as a matter of fact, provides the meal period, but the only deficiency is the failure to provide the revocation notice, that that constitutes a violation of the wage order? What if the case says that? Well, this issue has never been squarely presented in any court that I'm aware of. But I think the answer is it's ordinary statutory interpretation rules. The Section 3C or, excuse me, 11C governing the meal period violations says that revocation language has to be in writing. And over and over again, the California Supreme Courts and other California courts have said we apply the ordinary rules of statutory interpretation. We give each word its meaning. And so, therefore, I think it has to be given effect here. Seems to be a technical violation as opposed to the failure to actually provide the meal period. So that's what's troubling me a little bit, that it's whether or not because of a technical violation, there should be deemed to be a violation of the wage order. And to be clear, Your Honor, we don't dispute that Mr. Stewart was able to take meal periods and he was paid for them. And certainly SLA wants you to believe this was a mere technical violation. Well, I'm just asking a question because it's not, we don't have the facts where the meal period was actually not provided. We just have, not just, but we have a failure to give, put the revocation language in the agreement. So two of the three requirements were met. And that's what my dilemma is, you know, in this appeal, is whether or not the failure to comply with one of the violations that's not depriving him of the meal period is enough to show a violation of the wage order. And I was just curious if there is a case that says one way or the other. There's not a case that says one way or the other. But I would say this. Anytime an employer fails to comply with the requirements to offer a strictly on-duty meal period or fails to comply with any statutory prerequisites, that's not just a technical violation. There's a real harm there. The Industrial Welfare Commission thought that this issue was important enough that it chose to expressly address it in the wage order and it chose to require employers to have to inform their employees in writing of their revocation rights. So given that, I don't think it's fair to simply say it's a mere technical violation. There has been a real harm here. There were two derivative claims, derivative of the substantive claims, that the district court also granted summary judgment on. Those were the waiting time penalty claims and the wage statement claims. We have challenged those on appeal only in connection with the meal period violations. I would probably just submit on the briefs as to those claims, unless the court has any particular questions as to them. Well, I guess I was worried that we're, do we have a willful and intentional violation? Well, I think it's important to keep in mind what the definition of willful is here. And it's not malicious. It's merely, did SLA fail to comply with a legal duty that it had? And it did. I mean, I think there's a good faith dispute here between the parties about this particular issue. But I'm still having a tough time, even under your definition, which you're now suggesting to say that it is willful and intentional. Well, SLA knew of this requirement, and we know it knew about it because it had a separate, it had both a 24-hour shift agreement and it had what it called a day car shift agreement, which governed shifts of eight and a half hours or less. It included the revocation language in its day car agreement. It failed to do so in its 24-hour agreement. And so when SLA knew about the requirement, it knew how to comply. I understood the reason it didn't include it in its 24-hour agreement is for the same kind of, if you will, considerations that it offered when it was not it but other parts of the ambulance industry challenged in the overtime area. Yes. So at that point, I'm, again, trying to figure out why it's willful or intentional. Well, and this is where I think we get into what I believe is the district court's over-reading of the Monzon case. The district court says, look, no 24-hour shift agreements need to be in writing, and it cites Monzon for that. But that's certainly not what Monzon holds. And so I think the district court just, as I said, read too much into it. Monzon just doesn't support that kind of broad-based holding. And neither Monzon nor the wage order nor any other case or body of law supports the notion that that section dealing exclusively with overtime compensation somehow relieves the employer of its duties with respect to what it has to do to provide an exclusively on duty. I think you jumped to conclusions. I mean, the problem that I have with this whole case is that it seems to me I can get where you want me to go in dealing with the parts of the industry which would definitely be affected by those wage orders and they interpret them to them. My problem is I've got a case dead on that's, I mean, in my book, an application of the law as it relates to the ambulance industry was not applied as I would have applied it if it hadn't been the ambulance industry as it related to the overtime and the 24-hour shifts. And I read through it to try to figure out what it is, and again, I'm still there. I don't know whether the California Supreme Court has had a change in feeling as it relates to ambulances because there's no question ambulance drivers have to be there all the time. It's not one of these things where ambulance drivers are like the other cases that are cited here that the California Supreme Court has, if you will, addressed those wage orders. So my worry is, and that's again where I am on willful or unintentional, to suggest that now St. Louis Ambulance is willful and intentionally doing that is a tough case for me. Well, I think the California Supreme Court wouldn't follow Monson in that it's really cluing us into that. Well, I understand your argument. I'm just trying to see if that's your argument. I don't think you need to even respond. You can save your time for another one. Okay, fair enough, Your Honor. All right, thank you, Counsel. Good morning. May it please the Court, I'd like to reserve five minutes for rebuttal myself. Let me begin by addressing some of the questions that you asked Appellant's Counsel on the merits appeal. And let me first take a step back because one of the key things to keep in mind is that the rest period cause of action and the meal period cause of action were not premised on merely alleging a violation of the wage order. They were seeking a penalty under Labor Code Section 226.7. The reason that is important is because, first of all, Labor Code 226.7, I believe it's subsection B, only authorizes the penalty when the employer fails to actually provide a rest period or a meal period that is in accordance with the wage order, not a technical violation. Second, subsection E says that the penalty is not authorized any time that the employee is exempted under any other provision of law, including other provisions of the wage orders. Subsection E gives this Court a basis, independent of all of the legal arguments made, to affirm the district court's determination that Mr. Stewart failed to raise a triable issue of fact with evidence showing either that he was ever denied a meal period. But Appellant's Counsel says part of the denial of the meal period, and that's why I ask her this question, is part of the denial of the meal, no, the rest period, is to have all of the required written agreements and the revocation. Do you take issue with that? Yes, Judge Rawlinson. Why? I believe you misspoke. I think you mean the meal period. The meal period. The argument is that there's a written component. There are two responses to that, and the district court pointed out both of them correctly. The first is, under Section 3K of the wage order, as interpreted by the Monzon case and the Al-Khmudi case, the only subject on which an ambulance company and an ambulance driver must agree in writing is the topic of whether to exclude hours from overtime. The other two topics mentioned in there, three one-hour meal periods and a sleep period of not less than, I'm sorry, not more than eight hours, those two topics, Monzon says, because of the federal regulations on 24-hour shifts in emergency services, those two topics do not need to be the subject of a written agreement. And Monzon's holding was that they may be the subject of a non-written agreement. Now, as the district court correctly discerned from that, if I do not have to have a written agreement with you as a 24-hour shift ambulance driver on those topics, then I certainly don't need to have a written agreement with you telling you that you can revoke our oral agreement or any other agreement on those topics. So the district court correctly pointed out that it would be entirely inconsistent with 3K and Monzon to impose the written requirement of Section 11 of the wage order on the topic of meal periods where the parties have agreed that you'll be paid even though under 3K we could exclude them entirely from the calculation of hours worked. So what's the precise language in Monzon that you're relying on to say that there is no requirement for a written agreement in the meal period context? Let's see precise language. I apologize to the court. I do not have Monzon in front of me. However, I'm looking at the district court's order. Well, I'm not interested in district court. You're relying on Monzon. So I'm curious, this is an overtime case, correct? Monzon is an overtime case, right? Al-Khmudi and Monzon both dealt with the overtime exemption of 3K. Al-Khmudi specifically had addressed Let's stay with Monzon because you relied heavily on that. It's an overtime case, so I'm trying to see how you're extrapolating the language from there into the meal period. That's why I asked you for the precise language. Could I finish my question? I apologize. I didn't mean to interrupt. So I wanted to know the precise language that you are extrapolating into the meal period context. Correct. In Monzon, the discussion was what do we do about the allegation that the sleep time needed to be compensated or should be counted toward overtime. And the issue arose in Monzon because, unlike Al-Khmudi, the parties in Monzon had not created a written agreement to specifically deal with the topic of not only 24-hour shifts, but also sleep time and meal periods. The ultimate conclusion of the court, based largely on the federal regulations, was that the agreement regarding how to treat sleeping time hours did not have to be reduced to writing and that it was proper for the court to rely on the evidence of the parties' oral agreement and implied understandings regarding sleep time. And in doing that analysis, the court said, you can have an agreement that is lawful under 3K and yet is not reduced to writing on the topics other than the overtime aspect. So on the topics of sleep time and the three one-hour meal periods, whether the agreement is that we will exclude them from hours worked or whether the agreement is, as in Al-Khmudi, we will nevertheless pay you for them, even though you're undisputedly asleep, that it doesn't have to be in writing. It follows that if it doesn't have to be in writing on those two topics, sleep periods, meal periods, then you can't create a conflict with another part of the wage order by saying that you have to have a written agreement that says you can revoke it in writing. Now let me move on to the second point that the district court made that is also important and that has nothing to do with Manzan. The district court found that the parties here had, in Mr. Stewart's 24-hour shift agreement, included a provision that expressly acknowledged that the agreement itself was at will. And Mr. Stewart acknowledged in his deposition, and it was in the undisputed facts, that he understood that the at-will provision meant that at any time and for any reason he could revoke his agreement providing for 24-hour shifts of duty, providing for three paid one-hour meal periods, providing for paid sleep periods. So the district court found, in fact, that the agreement Mr. Stewart entered into with San Luis Ambulance had a written provision that substantially complied with the requirements of Section 11 with regard to an expression in writing that he had a right to revoke the agreement. All right. Allow me to turn to the rest period issue. The question... I'll be fair. I think we can understand your idea on the rest issue, but I'm interested in Judge Rawlinson's questions about that. I guess my worry about what the court has done to the question, to the cases as it relates to Huck Moody and Monzon, it seems as if they've been very critical of them, and they only stand because they didn't throw them out. So, and then I get these other issues, other cases, which in my book, if I were to follow those cases and apply just the wage orders, it would seem to me that you would not win. So I'm trying to figure out, does this warrant me certifying this case to the California Supreme Court? I would respectfully suggest it does not for the following reason. Let's not lose sight of the fact that the appeal is from a summary judgment or some partial summary judgment grant. That grant was based on the failure of Mr. Stewart to create a triable issue of fact. Now, let us focus on the facts that are in the record that are very different from the facts that were decided in Augustus. In Augustus, you had security guards who had to keep the walkie-talkie with them, had to stay in the guard shack. The record in this case shows, and the district court's order reflects its findings on these points, that Mr. Stewart was not required to stay in the rig. He was not required to stay in the station. He was permitted to leave the station. There was evidence that he frequently did so. There was nothing to restrict him from engaging in purely personal pursuits during that 10-minute period of rest. The evidence was that he frequently slept, watched TV, surfed the Internet, went outside to make personal phone calls. He admitted a total inability to identify a single occasion or to point to any of his actual time records showing that there was ever a shift where he did not have the opportunity to take at least three 10-minute rest periods without interruption. Now, why is that important? Because the California Supreme Court in Augustus, which it acknowledged was decided only under wage order 4 or wage order 5, not wage order 9, and neither 4 nor 5 governs ambulance drivers nor has section 3K regarded. But the principle is the same, though. And the words are the same. The words in the rest period section are in fact the same, but you have to take into account 3K when you're deciding how do I interpret and reconcile disparate parts of the wage order when you're looking at wage order 9. Nevertheless, let's go back and see what they had to say in Augustus about what it means to have rest periods, because there's a potential here for us to get hung up on semantics when in fact what counts are the facts. Well, the difficulty is that we, it's our task to predict how the California Supreme Court would rule if this issue were before it. If we don't certify it, then we have to predict how the court would rule. So that's why we are delving into these particular points. Understood. Let me respectfully disagree that you need to certify it because I think... I'm not saying we need to certify it. I'm saying if we don't certify it, we need to predict how the court would rule. Let me respectfully suggest you don't even need to predict how the court would rule. Let's look at what they said in Augustus and then apply it to these facts, because the court denied summary judgment, I'm sorry, granted our partial summary judgment based on their inability to produce evidence of certain facts. Here's what the California Supreme Court said in Augustus. Right now I'm looking at page 826, the front part of their holding. During required rest periods, employers must relieve their employees of all duties and relinquish any control over how they spend their time. If you look in the record, the record is clear. Mr. Stewart failed to introduce evidence that at any shift he did not have the opportunity to do whatever he wanted or leave the station or the rig for three 10-minute periods of rest. So is it your argument that the employer relinquished control over him during those periods? Yes. He was not subject to being called back. He was subject to the hypothetical necessity to respond to a call, which raises the question. Is that relinquishing control in your mind? Yes. If the hypothetical doesn't come to pass, if Mr. Stewart's asleep and no call happens. Whether the hypothetical comes to pass or not is not the question. As to control, the control is they have the control. And whether it happens or not doesn't eliminate the control. In fact, Your Honor, it does because as the court said in Augustus, nothing in our holding circumscribes an employer's ability to reasonably reschedule a rest period when the need arises. That doesn't solve your problem. Well, it does in this case because the district court found that in every one of Mr. Stewart's logs, there were hours of time when he was not being interrupted by or responding to a call. That suggests that just simply because he wasn't that there's a problem. The problem that I had with your interpretation there is if they have the control, it seems to me that what Augustus suggests is that they reschedule the periods of time when there is no control. And the reason you can't read that into Augustus, Your Honor, is because if you engage in that interpretation, then wage order nine becomes internally explosive. Because you cannot have a section in 3K that specifically authorizes, quote, 24-hour shifts of duty for ambulance drivers, and at the same time require that during some portion of those 24 hours, they be not subject to the hypothetical interruption. The only way to reconcile those two sections within the wage order is to read Augustus and realize that the hypothetical interruption of your rest period is not the same as the actual interruption. Here, any time Mr. Stewart was interrupted, he had other opportunities throughout the day to take that 10-minute rest period that just didn't occur because you got interrupted and leave the station, leave the rig, engage in purely personal pursuits, which is why the district court found that he failed to introduce any evidence that he was ever denied an actual opportunity to take 10 minutes of rest, which is all that Augustus requires. I will reserve the rest of my time. Well, you don't have any time. You're over, but could you briefly address your cross-appeal? Yes. The bottom line on the attorney's fee appeal is that it is the clear law that an attorney's fee award must be commensurate with the result achieved. There is not a single case decided under the Fair Labor Standards Act that finds it commensurate to award more than 100 times the amount recovered in attorney's fees, and yet the district court here ended up awarding 177 times the amount recovered, where only $750 was recovered. So do you take issue with the hourly rates? We did in the trial court. It is not an issue on this appeal. And you don't take issue on appeal with the number of hours claimed? I don't know precisely what you mean by that. The number of hours that they said they spent working on the case, do you take issue with that? We take issue with the hours that the court used that were taken, for example, from the Javine case. Other than that? We take issue with the hours that the court relied upon that had to do solely with the discovery dispute and the pleading amendment motions that related only to the PAGA cause of action, which had no overlap or relationship whatsoever with the Fair Labor Standards Act overtime plan. But it was my understanding that if you took issue, you took issue in the district court, right? Yes, we certainly took issue in the district court. And the district court ruled against you? Yes, it did, incorrectly. Well, I understand you say incorrectly, but now we're at an abuse discretion standard, aren't we? We are not with respect to a number of the issues, Your Honor. Which ones? I mean, my worry is that most of your claims go to what you dispute as to the hours and as to the amounts paid for the hours and whether they should have been paid at all. And I'm trying to figure out why those aren't abuse of discretion standard decisions. There's a number of reasons why they're not. First, as I mentioned, there's the overarching consideration, the obligation to achieve an answer. I understand that overarching, but what else? Second, with respect to the Jayvine fee issue, the Jayvine case resulted in a final judgment. That final judgment was based on an accepted Rule 68 offer. The question of collateral estoppel effect of the Jayvine judgment is a question of law. The question of the interpretation and application of the accepted Rule 68 offer in Jayvine, that is a question of law. Counsel, could you stay between the mics, please? I'd be happy to. Thank you. Well, therefore, we got the Jayvine issue, which she's now questioned. What else? The Jayvine issue, of course, the moment that you either exclude those $18,000 of fees or you give us an offset because we paid those $18,000 for those hours in paying the Jayvine settlement. The minute you give us credit, it moves you on to the next question. Did they do better than the two consecutive Rule 68 offers that they turned down? And the moment you exclude those Jayvine amounts, the answer is no, they did not, according to the district court's own math. So if there was an error of law on either the collateral estoppel or the interpretation and application of the Jayvine Rule 68, it flows directly into the trial court's own math establishing that they did not do better. The moment that you accept that proposition, you must apply the court's, the Ninth Circuit holdings regarding what's the appropriate mechanism for adjusting downward fees incurred after turning down a reasonable Rule 68 offer. Here, the court made no effort to adjust those fees downward because it didn't find that there had been a better offer or, in this case, two better offers that were each turned down. All right, counsel. We'll hear from the other side and then give you a couple of minutes for rebuttal. Thank you, Your Honor. On the cross? On the cross appeal. Thank you, Your Honor. Let me start by addressing the fees issue. As Judge Smith pointed out, this is an entirely discretionary determination, and there's no requirement in the law of this circuit that there has to be some kind of proportionality between the damages recovered and the attorney's fee award. Well, the issue of whether or not the Rule 68 offer was better is not necessarily an abuse of discretion, is it? Well, the Rule 68 issue I think is really beside the point. Even if this court were to conclude that one or the other of the Rule 68 offers were more favorable, and I can explain why they were not based on this court's champion decision, but even if they were, this court's decision in Hayworth says, so what? Because the underlying statute here is the FLSA, and because the FLSA defines attorney's fees separately from costs, Rule 68 fee shifting doesn't even apply. So irrespective of why it doesn't apply if the district court included the attorney's fees in calculating whether the Rule 68 was triggered. Well, in determining whether the Rule 68 offers were more favorable, the district court under champion had to consider the fees that were accrued as of the date of those offers. And when you look at what those fees were, they dwarf what the Rule 68 offers were. So that resolves the Rule 68 issue. But even if it didn't, Hayworth resolves it, because Hayworth says even if one of these Rule 68 offers were more favorable, the underlying statute being an FLSA statute, plaintiff is still entitled to recover post-offer fees. So what is your response to opposing counsel's position that once the fees were paid in the prior case, those should have been offset? That seems like a reasonable position. Seems like it, but it's not. Why not? Because he is ignoring the fact that Mr. Stewart's counsel were appointed by the district court to represent the interests of the consolidated case. That means both J. Vine and Stewart. But that was after the fees had been paid already for the J. Vine case. That case was closed before the cases were consolidated. Isn't that correct? No, I don't think that is correct. The counsel was appointed in March of 2014. The J. Vine case and the Stewart case are both filed in the fall and winter of October 13. But at the time they were filed, counsel was not counsel for Stewart. Counsel that was appointed to represent the consolidated action just a few months later, in March 2014, was representing the consolidated case, both parties, although their appearance. Your answer was that he disclaimed any representation of Mr. Stewart. No. What happened was the J. Vine action was filed in October of 2013 by one set of attorneys. In December of 2013, Mr. Stewart files his claim, his case, with virtually identical claims. But a different attorney, right? Different attorneys, yes, Your Honor. In March 2014, the court appoints Mr. Stewart's counsel to represent the consolidated case, both J. Vine and Stewart, because the claims are identical. The case proceeds to litigation. J. Vine ultimately settles. All the filings had been under the J. Vine case number to that point. Once J. Vine settles, the court reopens Stewart administratively, and counsel continues doing what they had been doing all along, representing. At what point were the fees paid for the J. Vine case? And if the cases were consolidated, why were fees paid at that point? Because only J. Vine settled. Stewart remained active and open. And if you look at the billing records in the record that were sought in connection with this fee award, counsel did not seek any fees exclusively or did not seek any fees at all in connection with work that was performed exclusively in J. Vine, so things like the motion for class certification or the motion to amend the complaint. The work that counsel sought fees for was all work that benefited and advanced the consolidated case, discovery that was taken, depositions that were taken. And let me put it this way, too. The attorneys here who initially represented exclusively Mr. Stewart and then became appointed by the court on behalf of the entire action, they performed all this work pursuant to their duties to do so. Under SLA's logic, if these billing records had appeared on the records of J. Vine's or, excuse me, Mr. Stewart's original counsel, they would pay it. The fact that it's simply on the billing records of counsel for the consolidated case is immaterial. So it makes perfect sense that the court would have awarded the time that was the pre-J. Vine settlement time that counsel accrued in this case because it advanced the entire case. And the total amount of fees in connection with that was actually about $36,000, and the district court reduced it by 50%, which is an entirely reasonable exercise of discretion in saying, well, the cases were consolidated. I'll apportion 50% to J. Vine. That's already been paid. I'll apportion 50% to Stewart. You can recover that. That was an entirely fair exercise of discretion. Any other questions? Not about that. Do you want to respond to the argument he made as to the other than the attorney's fees question? I'll respond just briefly. If you don't, I think I have the arguments well in mind. I just didn't know if you wanted to add something more because what he's suggesting is these cases do apply. They're dead on. They are telling me what I ought to do because, as it applies to 3K, I've got a clear shot now what I need to do, which is totally opposite of what you told me. It is entirely opposite, Your Honor. We could not be farther apart on this issue. So help me. Yes. Why is he wrong? Let me try again, and I'm going to try again by way of trying to answer a question that Judge Rawlinson posed, and that is, what's the language in Manzan that we're talking about here? Manzan, again, deals with the overtime provision. And the very first sentence of Manzan is this. The very first sentence is, The major issue raised by this appeal relates to the proper method to use in calculating overtime. Manzan did not deal with all the facts and circumstances that could arise concerning when a written agreement needs to be in place between employer and employee. And then the critical sentence in Manzan that I think SLA hangs its entire argument on is this one. We hold that it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on 24-hour shifts. That only deals with compensation. It says nothing at all about the on-duty meal period requirement. And then we turn to Mendiola. Manzan is 27 years old. It was issued by an intermediate California court of appeal over a dissent. I would urge this court not to follow a precedent of nearly 30 years old that is the law only according to two California justices. But it's the law, until overruled by the Supreme Court. It's the law on compensation agreements. It says nothing on on-duty meal periods. It doesn't relieve an employer of complying with 11C. It doesn't say that, and no decision says that. And then when you turn to Mendiola, Mendiola really doesn't like Manzan. It doesn't like its language. It says, not a paragon of clarity, limited in its scope. And then in footnote 15 it says, even the holding of Manzan is bizarre. It doesn't make any sense because what it means is, oddly, says the Supreme Court, this interpretation means an employer needs a written agreement to avoid paying overtime, but does not need a written agreement to avoid paying any compensation at all. I think the California Supreme Court is saying. It should have overruled it then. Well, the issue wasn't squarely presented. In fact, it says the application is not at issue here. That's why it didn't overrule it. Well, it would certainly be directly in front of it if I sent it over there on this case. It would indeed, Your Honor. It would indeed.  All right. Thank you, counsel. Thank you, Your Honor. Thank you all, counsel, for your helpful argument. The case just argued is submitted for a decision by the court. Your Honor. Oh. Oh, yes. I apologize, but you had a chance. Oh, I did? Okay. I might not have a chance. Okay. I'll give you a couple minutes. Thank you very much. All right. Thank you for reminding me. Let me quickly address an issue that I think is a straw man issue. Counsel suggests that it is, quote, immaterial that the time billed in the Javine case was billed by counsel for Javine, the Boren and Baltadano firms. And she argues that had that same time actually been incurred by Dion Kindem and Mr. Blanchard, counsel for Stewart, that we would have gladly paid. Now, of course, they didn't bill at the time. The reason it's not immaterial is because Mr. Baltadano, counsel for Javine, accepted a Rule 68 offer in Javine that told him he was going to be paid $115,000 for all of the costs and attorney's fees, as well as the underlying liability in that case. And he accepted that offer. And Merrick v. Chesney says that we have the right to write an offer and have him understand that it wipes out all liabilities. And we actually paid that liability. They got the $115,000. They got paid for every minute of time that they billed in the Javine matter. But she's saying that because the cases were consolidated, that they weren't paid for the consolidated case, and that that's her counterargument. What's your response to that? My response to that is at no point in time, prior to the acceptance of the Javine offer and the entry of the Javine judgment, was the Baltadano or Boren firm ever counsel of record for Mr. Stewart. When I asked her that, she said that was not correct. Well, it is correct, Your Honor. It's in the record. He always at all times had his own counsel, Dion Kindem and Blanchard. They never withdrew. They never associated any others. My problem, again, I know you suggested that I was out to lunch, but my problem on this is that it seems to me that as long as the district court correctly applies the Rule 68 standard in determining the factors or the facts to be involved in that application of standard, that, again, is discretionary. Well, I know you suggest no, that isn't discretionary at all, but I don't think you got a case on that. And furthermore, I believe that in these kind of circumstances, unless that district court is clearly erroneous in its application of the facts to the standard, I don't undo the district court. And that's the reason I asked the question I did.  I don't think that's a question of law at all. Your Honor, the Hayworth. I understand what Hayworth said. This court in Hayworth said, We review de novo, however, any elements of legal analysis and statutory interpretation which figure in the district court's award. Alas, legal analysis and statutory interpretation? There's no legal analysis in determining what to do with the Rule 68 offer of proof. It's a matter of determining what exactly, whether it was made or whether it wasn't made. That can't be a legal decision. I think that we could all agree that how to apply principles of res judicata and collateral estoppel is, at the end of the day, a legal analysis. I agree with that. The Stewart's counsel has never, in the briefing, contested the res judicata or collateral estoppel effect of the Javine final judgment, which was based on their acceptance of the Javine offer. But the problem is the district court, because they were appointed as counsel for the consolidated case, the district court could have said, well, half of it is attributable to Stewart and half of it is attributable to Javine. Isn't that a discretionary call? That is not a discretionary call, Your Honor, because, A, it violates, that basically allows the court to go back and amend the Javine judgment, which is effectively what it did. And yet, of course, there was no timely motion to do that. And it violates principles of collateral estoppel. And it's contrary to the Rule 68 offer in Javine that the Baltadano and Boren firms accepted in Javine that said they would only receive $115,000 for all the work they'd done in that case on behalf of anyone that they purported to represent. Now, when they accepted that, class certification had already been denied. When they accepted that, according to Mr. Baltadano's sworn statement to the district court in this case, no one at his firm had ever represented Mr. Stewart in any capacity, whether it was, and here's his quote, as of February 26, 2015, that's the date they accepted the Javine Rule 68 offer for $115,000 for all costs, fees, and liabilities, neither I nor my co-counsel, Paul Haynes and Fletcher Schmidt, represented Plaintiff Stewart at that time, including as interim lead class counsel since the court on January 13, 2014, denied Plaintiff Javine's motion for class certification under Rule 23. My office and Mr. Haynes' office did not file associations of counsel in the Stewart action until March 17, 2015. That's after the first Stewart Rule 68 offer, and it's more than a month after the Javine Rule 68 offer. The interpretation of the Javine Rule 68 offer is a question of statutory interpretation, contractual interpretation. There's absolutely no question that is subject to de novo consideration by this court. The application of collateral estoppel and the proper case law treatment of the effect of including those Javine fees in this case, that is subject to de novo review. And let me, I guess, just try to crystallize why this ought to trouble the court. In March of 2015, after Javine's counsel, who is not yet representing Stewart, has accepted an offer that all of their time in the Javine action will be compensated by $115,000 in that case, the defendant in the Stewart case has to write a Rule 68 offer or chooses to write one in the Stewart case. At that time, Stewart has only two counsel of record, Dion Kindem and Blanchard. We write to them the Rule 68 offer. There is no way for us to know in writing to them that there should be an inclusion for them of fees allegedly occurred by someone who doesn't represent him. They, in considering whether or not to accept our offer, cannot conceivably evaluate it based on fees incurred by someone else in another action that has already been settled and is now the subject of a final judgment. It would absolutely undermine the policy purpose behind Rule 68 to give the interpretation or the legal analysis that the district court did in this case with regard to the Javine fees, with regard to the appropriate yardstick to use when looking at did they do better or did they do worse. We respectfully submit that that's why you need to reverse the trial court, send it back with clear instructions how to correctly apply the correct legal analysis, the correct statutory interpretation, and to reach a commensurate result. Thank you, counsel. Thank you. Now, thank you to both counsel. Thank you. The case is argued and submitted for decision by the court.
judges: Rawlinson, N.R. Smith, Korman